## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| DURGA PRASAD SEGABANDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14CV1082 HEA |
| | ) | |
| PINNACLE TECHNICAL | ) | |
| RESOURCES, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary
Judgment, [Doc. No. 51].  Plaintiff opposes the motion and the matter is fully
briefed.  For the reasons set forth below, the Motion is granted.

## Facts and Background

Plaintiff Durga Prasad Segabandi is from India. Segabandi worked for
Defendant Pinnacle Technical Resources, Inc. through the H-1Bvisa program
beginning in 2006.  Plaintiff's initial H-1B with Pinnacle was from January 2006
through January 2009. Pinnacle employed Plaintiff over a seven-year period from
2006 to 2013, with four separate assignments.  For each assignment, Pinnacle
issued Plaintiff an offer letter stating the relevant details of the position offered,
including the wage rate.

Plaintiff admits he received and accepted an offer letter for each assignment.

Plaintiff also admits he was paid at or above the hourly wage rates set out in

His offer letters at all times during his employment with Pinnacle and that he was

compensated for all hours he worked.  Plaintiff was not paid time when he was not

working, nor were benefits paid during these periods.

Pinnacle sponsored Plaintiff's H-1B visa from 2006-2012.  As required by

the H-1B sponsorship process, Pinnacle submitted documents to the Department of

Homeland Security ("DHS") regarding its employment of Plaintiff. These

documents identified Plaintiff's pay rate and the prevailing wage for the positions

he would occupy.  Plaintiff was neither involved in preparing these immigration

documents, nor in determining the prevailing wages; nor were those details

discussed with him. In fact, the information was not provided to Plaintiff until after

the H-1B applications were submitted to DHS.

Plaintiff also admits he signed Pinnacle's onboarding documents, including

its Terms of Employment and an acknowledgement that he received a copy of the

employee handbook.  The Terms of Employment stated, "Pinnacle shall not pay

any business -related expenses without prior written authorization from Pinnacle.

Verbal approvals or client approvals are not sufficient."

After completing the visa transfer, in February 2006 Plaintiff began working

for Pinnacle as a Unix Administrator providing services to one of Pinnacle's

clients in Missouri.  Plaintiff acknowledges Pinnacle paid him $34.00 per hour

[2]

($70,720 annualized) plus benefits for all hours he worked.

Plaintiff began his second assignment with Pinnacle on August 22, 2008 as a Unix Administrator for another Pinnacle client in Missouri.  Plaintiff was paid for all hours at $40.00 per hour ($83,200 annualized) plus benefits.

Plaintiff next worked on another assignment with Client A.  The position was a Unix Administrator position in Missouri, and Plaintiff was paid $40.00 per hour ($83,200 annualized).

Plaintiff admits he does not know of a situation in which Pinnacle paid someone when they were not working—regardless of their citizenship or national origin.

Pinnacle issued Plaintiff an offer letter for $31.00 per hour ($64,480 annualized).  Plaintiff accepted the offer and began working for GIS/Seagate in February 2010.  Plaintiff admits Pinnacle paid him $31.00 per hour for all hours he worked on this assignment.

In December 2011, Plaintiff received an email from a paralegal at his immigration counsel's office containing language his immigration counsel said needed to be included in an "Employment Letter" to be provided to DHS in support of Plaintiff's application for a green card.  The language the paralegal provided read, "This is to certify that Durga Segabandi is employed by Pinnacle Technical Resources, Inc. as a Programmer Analyst. Upon obtaining Permanent

Residence status, his salary will be $85,634 per year."   Plaintiff asked Pinnacle employee Jessica Narvaez to prepare the letter, email or fax a copy to his attorney's office, and send the original to his home address. Narvaez complied with Plaintiff's request.

On March 8, 2013, Plaintiff voluntarily resigned his employment with Pinnacle.

Plaintiff contacted an attorney who prepared and filed a charge of discrimination against Pinnacle with the EEOC. The EEOC charge states, "While employed by Pinnacle I was paid approximately $20,000.00 less than the minimum annual salary for an employee with my experience and technical abilities because I am a non-U.S. citizen and initially was not a permanent resident of the U.S."  Plaintiff also alleged, "The only reason Pinnacle refused to pay me the minimum salary was because my nationality is other than U.S. citizen."

In the LCA submitted on January 6, 2006, Pinnacle identified the prevailing wage for a Programmer Analyst in the St. Louis area as $63,981.00 and indicated that Plaintiff's wage rate would be $68,000.00 per year.  After that LCA was presented to DHS, Pinnacle offered and Plaintiff accepted employment with Pinnacle at a rate of $34.00 per hour plus benefits.

On September 12, 2008, Pinnacle submitted another LCA to extend Plaintiff's H-1B Visa through January 2012. (Ex. F). In this LCA, Pinnacle

[4]

represented the prevailing wage for a Programmer Analyst in the St. Louis area to be $81,765.00 and indicated that Plaintiff would be paid between $81,765.00 and $86,000.00 per year.  At the time Pinnacle made these representations to DHS, Plaintiff was assigned by Pinnacle to work for a client at a rate of $40.00 per hour plus benefits.

The final LCA submitted by Pinnacle is dated January 19, 2012. (Ex. S at 4). In this LCA, Pinnacle represented the prevailing wage for a Programmer Analyst to be $54,579.00 and indicated Plaintiff would be paid $1,240 per week.  At the time this LCA was submitted to DHS, Plaintiff was working at a rate of $31.00 per hour plus benefits.

After receiving the original Employment Letter, Plaintiff did nothing to change his position. Indeed, during his deposition, Plaintiff admitted he took no action in response to receiving the Employment Letter aside from filing the document in his records.  Plaintiff inquired about several in-house positions at Pinnacle that he was willing to work and also brought several outside positions that he was interested in working to Pinnacle.

In January 2006, Pinnacle submitted a Petition for Nonimmigrant Worker, Form I-129, to the Department of Homeland Security indicating that it would employ Durga Segabandi from January 27, 2006 to

January 18, 2009, in which it indicated that it would pay Segabandi $68,000 per year.

In January 2006, Pinnacle also submitted Form ETA9035E, Labor Condition Application for H-1B & H-1B1 Nonimmigrants, in which it indicated the prevailing wage for "Programmer Analyst" workers in Segabandi's position to be $63,981.00, which is the minimum amount that must be paid to the Nonimmigrant worker.

Upon submitting the LCA, Pinnacle declared that it would "[p]ay nonimmigrants at least the local prevailing wage or the employer's actual wage, whichever is higher, and pay for non-productive time" and that it would "[o]ffer nonimmigrants benefits on the same basis as U.S.  workers."  Pinnacle was required to update the Labor Condition Application if Mr. Segabandi's position had changed.

Pinnacle did not pay Plaintiff his wages and medical benefits during the period July 2008 through August 2008 when Segabandi was in a non-productive status.

Pinnacle did not update the LCA during the period Segabandi was not working from July 2008 through August 2008 and again from April 2009 through February 2010.

In the fall of 2008 Pinnacle submitted another LCA indicating that it would employ Segabandi from January 19, 2009 through January 18, 2012; it also indicated that Segabandi's rate of pay was $81,765.00, equivalent to the prevailing wage for Programmer Analysist in St. Louis.

In January 2009, Pinnacle submitted another Petition for Nonimmigrant Worker, Form I-129, to the Department of Homeland Security indicating that it would employ Segabandi from January 19, 2009 through January 18, 2012, in which it indicated that it would pay Segabandi $83,200.00 per year.

In support of the H-1B/I-129 Extension on behalf of Segabandi, Pinnacle submitted a letter to U.S. Citizenship & Immigrations Service, dated September 9, 2008, signed by Jessica Navarez, V.P. of Human Resources for Pinnacle, indicating that "Pinnacle Technical Resources, Inc. wishes to retain Mr. Durga Segabandi's temporary professional employment for a projected 36-month period as a Programmer Analyst at a salary of $83,200 per year."

Pinnacle issued an employment verification letter dated March 10, 2009 in which it confirmed Durga Segabandi had been rehired by Pinnacle at a rate of $40.00 per hour, or approximately $83,200.00 per year.

Plaintiff's H1-B Visa was extended in response to Pinnacle's application for the period January 19 2009 through January 18, 2012.  The Department of Homeland Security issued an Approval Notice for the H-1B Extension Application

[7]

for the period January 19, 2009 through January 18, 2012, indicating that "The foreign worker can work for the petitioner, but only as detailed in the petition for the periods authorized. Any change in employment requires a new petition"

Pinnacle assigned Segabandi to work at AT&T, a second time, in February 2009.

Pinnacle issued an employment verification letter dated March 10, 2009 in which it confirmed Segabandi had been rehired by Pinnacle at a rate of $40.00 per hour, or approximately $83,200.00 per year. The assignment at AT&T ended on April 10, 2009.

Segabandi did not have an assignment from April of 2009 through February of 2010.  Pinnacle did not pay Segabandi from April 10, 2009 through February of 2010. Pinnacle did not update the LCA during the period Segabandi was not working from April 2009 through February 2010.

Pinnacle told Segabandi to look for his own job assignments. Plaintiff brought several assignment opportunities to Pinnacle during the period from April 2009 through February 2010, however, Pinnacle told Plaintiff the assignments were not feasible and did not assign him to those projects. Segabandi asked his manager Kyle Pittenger that if Pinnacle was not going to assign him, if they could give him a job in-house at Pinnacle.  Segabandi identified several in-house

positions within Pinnacle that he would be willing to work and informed Kyle
Pittenger that he would like to be placed in these positions; however,
Pittenger never replied to his request.

Segabandi identified an assignment at a company called Seagate, which he
brought to Pinnacle in February 2010. The position at Seagate involved several
"middlemen" companies, whereby Seagate had contracted with a company GAVS;
GAVS then contracted with Global Information Systems (GIS); and GIS then
contracted with Pinnacle for the position.  Pinnacle paid Segabandi a wage of only
$31.00 per hour, or approximately $64,480 per year, while he worked at Seagate
because of the numerous middlemen. Pinnacle did not update the LCA
when it began paying Segabandi only $31.00 per hour instead of the $40 per hour
previously stated in the January 2009 LCA, until it filed a subsequent LCA almost
2 years later, in January 2012.

In January 2012, Pinnacle submitted a third LCA to the Department of
Homeland Security indicating that it would employ Segabandi from January 19,
2012 to January 18, 2015, and that it would pay Segabandi $1240 per week, or
approximately $64,480 per year.

In the January 2012 LCA, Pinnacle represented that Segabandi's then
current position was only a Level II wage level for which the prevailing wage was
only $54,579.00.

Previous LCA forms submitted by Pinnacle had Segabandi at the higher wage Level IV for which the prevailing wage was $81,765.00 and $85,634.00.

In total, Pinnacle submitted three applications for Segabandi's H-1B Visas, one for the period 2006 through 2009, one for the period 2009 through 2012 and one for the period 2012 through 2015.

Prior to Segabandi working for Pinnacle in 2006, Pinnacle represented to him that it would sponsor his Immigrant Petition for Alien Worker, or green card" processing, as they do for other foreign workers.

Segabandi claims to have relied upon Pinnacle's representation that it would handle his green card processing in his decision to go to work for Pinnacle.

Pinnacle sponsored Segabandi's Immigrant Petition for Alien Worker, or "green card."  Jessica Navarez, asked the attorney to begin the Green Card application process.  Attorney Susan Lane represented Pinnacle and Segabandi in regards to Segabandi's green card application. James Humrichouse, President of Pinnacle, issued a letter to the U.S. Citizenship & Immigration Services, dated April 24, 2008, in which it indicated that had the ability to pay Segabandi $85,634 per year, that it continued to have that ability and that its economic condition was sound with sufficient ability to pay the $85,634 wage. Ximena Vaca, CEO of Pinnacle, executed a letter dated December 12, 2011

certifying that Segabandi was employed at Pinnacle Technical Resources, Inc. as a Programmer Analysist and upon obtaining his permanent Residence status; his salary will be $85,634 per year. Pinnacle gave a copy of this letter to Segabandi.

Pinnacle did not pay for any of Segabandi's green card expenses even though they generally pay the fees for all applicants. Segabandi received his green card in February of 2012.

Plaintiff requested that Pinnacle raise his rate above the $31 per hour. Pinnacle did not raise Segabandi's rate above the $31 per hour that he was being paid after he received his green card.

Plaintiff's manager, Kyle Pittenger, made statements to Segabandi that he was unfit to work for AT&T, that Segabandi interpreted to be a slur or racial epithet related to his national origin. Segabandi asked Pittenger if he told him he was "unfit" because of his nationality, and Pittenger did not respond.

Segabandi interpreted Pinnacle's failure to pay his salary and refusal to give him an assignment to be discriminatory because of his national origin. Segabandi interpreted Pinnacle's Vice President Freddie Vaca's refusal to pay Segabandi's green card expenses to be discriminatory because of his national origin.

Segabandi interpreted Jessica Navarez's refusal to respond to Segabandi's email communications to be discriminatory because of his national origin.

Segabandi interpreted Pinnacle's failure to pay him at the rate of $85,634 per year after getting his permanent resident status as it had promised, to be discriminatory because of his national origin.

Segabandi decided to leave Pinnacle because he believed he was not being treated fairly and because he was not being paid what he believed they had promised him as indicated on his green card, ETA 9098 document.

Plaintiff brings this action seeking damages for the alleged violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.  § 2000e, *et seq.* Additionally, Plaintiff alleges Missouri State law claims: violation of the Missouri Human Rights Act, § 213.010 R.S. Mo. *et* seq.; breach of contract; fraudulent misrepresentation; and *quantum meruit*.

Plaintiff claims Defendant failed to pay him the wages listed in the LCA forms; failed to pay him for periods he was in a nonproductive status; Defendant failed to pay him prevailing wages; and Defendant failed to pay him benefits or allow him to be eligible for benefits on the same basis as its U.S. workers.  Plaintiff claims that he was not paid equivalently to similarly situated individuals

## Standard of Review

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.,* 445 F.3d 1106, 1109 (8th Cir.2006) (quoting *Bockelman v. MCI Worldcom, Inc.,* 403 F.3d 528, 531 (8th Cir.2005)). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed.R.Civ.P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324–25. In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)). A "genuine" dispute of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–50 (citations omitted).

## Discussion

[13]

Plaintiff alleges that he was discriminated against based on his national

origin, which caused him to leave his employment with Defendant.

Title VII makes it "an unlawful employment practice for an employer ... to

discharge any individual ... because of such individual's ... national origin." 42

U.S.C. § 2000e–2(a)(1).   Absent direct evidence of discrimination, the Court

applies the *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973).   *Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1010 (8th Cir.

2003) (en banc).   Under this framework, Plaintiff bears the burden of establishing a

*prima facie* case of discrimination.   *Torgerson v. City of Rochester*, 643 F.3d 1031,

1046 (8th Cir. 2011) (en banc).   The burden of production then shifts to the

defendants to "articulate a legitimate, non- discriminatory reason" for their actions.

*Dixon v. Pulaski Cty. Special Sch. Dist.*, 578 F.3d 862, 868 (8th Cir. 2009).   "'If the

defendant articulates such a reason, the burden returns to the plaintiff to show the

defendant's proffered reason is pretextual.'   *McGinnis v. Union Pac. R.R.*, 496 F.3d

868, 873 (8th Cir. 2007)."   *Henry v. Hobbs*, No. 15-1472, 2016 WL 3064567, at

*2-3 (8th Cir. May 31, 2016).

Likewise, the MHRA prohibits an employer from discriminating against an

employee on the basis of that employee's national origin. Mo.Rev.Stat.

§213.055.1(1)(a).   In order to prevail in a suit under this provision, a plaintiff must

demonstrate that (1) he suffered an adverse employment action; (2) his national

[14]

origin was a contributing factor in that adverse action; and (3) he incurred damages as a direct result.  *See Daugherty v. City of Maryland Heights,* 231 S.W.3d 814, 820 (Mo.2007). With respect to the second element, the Missouri Supreme Court has recognized that the "contributing factor" standard, which stems from the MHRA's prohibition of "*any* unfair treatment," is less rigorous than the "motivating factor" standard employed in federal discrimination cases under Title VII. *Id.* at 819. This distinction has led Missouri to abandon the *McDonnell Douglas* burden-shifting analysis applied in federal cases. *Templemire v. W & M Welding, Inc.,* 433 S.W.3d 371, 383 (Mo.2014) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Instead, if "consideration of [a] protected characteristic[ ] contributed to the unfair treatment, that is sufficient." *Daugherty,* 231 S.W.3d at 819.  *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1032-33 (8th Cir. 2016).

Plaintiff fails to present **any** evidence that he was treated differently than any other employee.  While attempting to establish that he was treated differently, Plaintiff presents instances which he "interpreted" as discriminatory.  Plaintiff himself attempts to classify actions as discriminatory, and appears to be goading employees to make discriminatory statements.  Plaintiff cites Jessica Narvaez's failure to respond to his emails as based on his national origin.  The mere fact that Ms. Navaez may not have responded to Plaintiff's emails, without more, does

nothing to establish discriminatory actions.  An employee who fails to respond to an email does not subject her employer to liability for discrimination.  Similarly, when urged by Plaintiff to acknowledge that his comments that Plaintiff was unfit for an assignment, Kyle Pittenger's lack of response does not transform into evidence of national origin discrimination.  Pittenger actually clarified the statement by explaining that he was merely relaying a decision reached by Defendant's client.

No employee of Defendant was paid when the employee was not working.  Ergo, this basis for Plaintiff's claim that he was discriminated against based on his national origin fails.  To the contrary, Plaintiff was treated exactly as similarly situated non-Indian employees.

The Court cannot even assume for the purposes of analysis that Plaintiff has made a *prima facie* case of discrimination.  The **only** examples of any reference to Plaintiff's national origin in this record are *Plaintiff's* attempts to categorize non-issues as issues of discriminatory animus.  In colloquial terms, Plaintiff appears to be attempting to "set up" Defendant for a lawsuit.  Defendant is entitled to judgment as a matter of law, pursuant to Rule 56 of the Federal Rules of Civil Procedure on Plaintiff's Title VII claim.

With respect to Plaintiff's remaining Missouri state law claims, the Court will decline to exercise supplemental jurisdiction, the basis for the Court's

[16]

jurisdiction.  The remaining claims are state law-based claims of national origin claims under the MHRA, breach of contract, fraudulent misrepresentation, and quantum meruit.   "A federal district court has discretionary power to decline the exercise of supplemental jurisdiction where the court has 'dismissed all claims over which it has original jurisdiction.'" *Wilson v. Miller*, ––– F.3d ––––, ––––, No. 15–1415, 2016 WL 1621952, at *6 (8th Cir. Apr. 25, 2016) (quoting 28 U.S.C. § 1367(c)(3)).  The factors a court should consider in deciding whether to exercise jurisdiction over pendent state law claims are "judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered...will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id*. at 350 n. 7, 108 S.Ct. 614; see also *id*. (stating that the factors to be considered under the pendent jurisdiction doctrine "usually will favor a decision to relinquish jurisdiction when 'state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or the comprehensiveness of the remedy sought' " (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). When declining to exercise supplemental jurisdiction under § 1367(c), the court can decide to dismiss the remaining claims without prejudice or remand those claims to state court.  *Lindsey v. Dillard's, Inc*., 306 F.3d 596, 599

(8th Cir.2002); *St. John v. Int'l Ass'n of Machinists & Aerospace Workers,* 139
F.3d 1214, 1217 (8th Cir.1998); *Graham v. Hubbs Mach. & Mfg., Inc.*, No. 4:14-
CV-419 (CEJ), 2016 WL 2910209, at *8 (E.D. Mo. May 19, 2016).  Based on the
factors outlined above, the Court will decline to exercise supplemental jurisdiction
over the remaining state law claims.  Said claims will be dismissed without
prejudice.

## **Conclusion**

Plaintiff has failed to present any evidence of any discriminatory conduct on
the part of Defendant.  Defendant is therefore entitled to judgment as a matter of
law.  Plaintiff has failed to meet his burden of  "com[ing] forward with 'specific
facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.
Corp.,* 475 U.S. at 587. Plaintiff has failed to produce a "genuine" dispute of
material fact that is more than "some metaphysical doubt as to the material facts."
*Id.* at 586.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary
Judgment, [Doc. No.  51] is **GRANTED** as to Count I.

**IT IS FURTHER ORDERED** that the remaining counts are dismissed

without prejudice.

A separate judgment and dismissal order will be entered this same date.

Dated this 1st day of June, 2016.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE